J-A02026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: S.P.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: G.M., III | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1059 MDA 2018 |

Appeal from the Decree Entered June 6, 2018
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  47 AD 2018

BEFORE:  LAZARUS, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY DUBOW, J.:                    **FILED JUNE 18, 2019**

G.M., III ("Father") appeals from the June 6, 2018 decree involuntarily terminating his parental rights to his minor daughter S.P.M., ("Child").[1] Because the record supports the decision of the orphans' court, we affirm.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

Child was born in October 2010 and Father only resided with Mother and Child for a few years. N.T., 6/4/18, at 7, 39-45.  In 2014, Father left the residence. *Id.* at 45.

From November 2015 through March 2016, Cumberland County Children and Youth Services ("CYS") provided services to Mother, Child and Child's half siblings.  In March 2016, CYS determined that the family had

---

[1] A petition seeking to involuntarily terminate the parental rights of H.P. ("Mother") was also filed.  The court terminated Mother's parental rights on May 18, 2018.  Mother has not appealed the termination of her parental rights.

moved to Dauphin County and referred the family to Dauphin County Social Services for Children and Youth ("the Agency").

In June 2016, the Agency removed Child from Mother's home because Father was incarcerated and unavailable to care for Child and Mother's significant substance abuse prevented her from caring for Child.[2]  *Id.* at 5. On June 15, 2016, the orphans' court adjudicated Child dependent and the Agency placed Child in a pre-adoptive foster home.  *Id.* at 22.

In January 2017, Father entered a guilty plea to drug charges and the trial court imposed a sentence of incarceration of three and a half to seven years.  *Id.* at 5, 43.

On July 11, 2017, the orphans' court made a finding of aggravated circumstances against Father based upon his minimal contact with Child.  *Id.* at 10.  The court also identified Father's goals as: (1) maintain communication with positive results, including attending court hearings, Agency meetings, and treatment plan meetings; (2) sign all requested releases; (3) notify the Agency of changes of telephone number or address within twenty-four hours; and, (4) comply with any recommendations from the criminal court and prison system, including drug and alcohol evaluation.  *Id.* at 8-17.

_____

[2] In particular, the Agency removed Child because (1) Mother had repeatedly tested positive for cocaine; (2) the Agency observed Child with her caretaker, Maternal Grandmother, during a home visit at which Maternal Grandmother appeared to be abusing substances; (3) Mother refused to submit to a drug test during a home visit; and (4) that same day, police officers arrested Mother and Maternal Grandmother for fighting in the street.  *See* Pet. for Involuntary Termination of Parental Rights, dated 5/3/18, at 1-9.

Father made minimal efforts to comply with these goals. He did not even sign the Family Service Plan until June 2017, one year after the Agency placed Child in foster care. *Id.* at 12-13. Additionally, Father made minimal effort to maintain a relationship with Child while incarcerated. Although the Agency allowed Father to have biweekly visits with Child, he did not attempt to schedule any visits and did not place Child's name on the prison visitation list. *Id.* In addition, Father never attempted to telephone Child. *Id.* at 9. Father wrote Child six or seven letters over the course of two years, beginning in 2017, even though the Agency urged him to do so as early as June 2016. *Id.* at 17-18.

Father was also minimally compliant with his other FSP objectives. Father did not provide updated contact information to the Agency after his transfer from county prison to state prison. *Id.* at 13. Father was active in completing treatment programs in prison, although he did not provide the Agency with evidence of this until January 2018. *Id.*

On March 26, 2018, the orphans' court changed Child's permanency goal from reunification to adoption. *Id.* at 16. Father did not appeal the goal change.

On May 3, 2018, the Agency filed Petitions seeking to involuntarily terminate Mother and Father's parental rights. *See* Pet. to Terminate, dated 5/3/18, at 1-18.[3]

On June 4, 2018, the trial court held a hearing on the Termination Petition. The Agency presented the testimony of Heather Gutshall, the family's caseworker. Father also testified at the hearing. N.T., 6/4/18, at 6, 27. At the conclusion of the hearing, the court terminated Father's rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b).

Father timely appealed on June 27, 2018, and simultaneously filed a concise statement of errors complained of on appeal. The orphans' court filed an Opinion pursuant to Pa.R.A.P. 1925(a).

**ISSUES ON APPEAL**

Father raises the following issue for our review:

Was the trial court correct to rule that [the Agency] proved by clear and convincing evidence that [Father's] parental rights to [Child] should be terminated?

Father's Brief at 3.

**LEGAL ANALYSIS**

We review cases involving the termination of parental rights according to the following standards.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and

---

[3] We note that the trial court found that there was no conflict for the Guardian at Litem to represent Child's best interests and legal interests at the termination hearing. *See* Order, 5/18/18, at 1.

- 4 -

credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Termination requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

This Court must agree with the trial court's decision as to only one subsection of 23 Pa.C.S. § 2511(a) in order to affirm the termination of parental rights. *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011). Here, we agree with the trial court's decision to terminate Father's parental rights pursuant to subsections 2511(a)(2) and (b). Accordingly, we will not address the remaining subsections of the statute.

Section 2511(a)(2) provides that court may terminate the parental rights of a child if the trial court finds, by clear and convincing evidence, that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but also whether the parent lacks the capacity to parent and has failed to remedy that incapacity. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Moreover, parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.* at 1117-18.

Our Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." *In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012) (citation and internal

quotation marks omitted). Notably, "the length of the remaining confinement can be considered as highly relevant to whether the conditions and causes of the incapacity . . . cannot or will not be remedied by the parent, sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2)." *Id.* (internal quotation marks omitted).

Also relevant are the efforts the parent made to care for a child before the parent was incarcerated as an indication of the efforts the parent will make when the parent is no longer incarcerated. *See Z.P.,* 994 A.2d at 1126 (terminating parental rights of incarcerated father after examining his parenting history before incarceration and finding "Father's overall parenting history revealed no genuine capacity to undertake his parental responsibilities"); *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008) (terminating parental rights of incarcerated mother after examining her pre-incarcerated parenting and determining that her repeated incarcerations indicated she did not have the capacity to parent).

Another factor to consider is the parent's effort to maintain a relationship with a child while incarcerated. *E.A.P.*, 944 A.2d at 83. However, this factor is not determinative because orphans' court may place weight on other factors even when the parent is doing what he is supposed to do while incarcerated:

> Each case of an incarcerated parent facing termination must be analyzed on its own fact, keeping in mind, with respect to subsection(a)(2), that the child's need for consistent parental care and stability cannot be put

aside or put on hold simply because the parent is doing what she is supposed to do in prison.

*Id.* at 84. In other words, orphans' court must consider "[t]he complete circumstances" of the case. *Z.P.,* 994 A.2d at 1125.

Applying these principles to the instant case, we conclude that the orphans' court properly concluded that Father could not remedy the incapacity of incarceration in a reasonable period of time and properly terminated Father's parental rights. Orphans' court described Father's contact with Child and his participation in family programs during incarceration as "belated." Trial Court Opinion, 8/17/18, at 6-7. Although Father knew of Child's placement in June 2016, he did not write to her until May 2017, almost a year later. *Id.* at 7. Further, the orphans' court notes that Father also waited more than a year to begin earnest participation in prison parenting programs. *Id.*

Additionally, while Father may be eligible for parole in July 2019, more than a year after the termination hearing, there is no guarantee that the parole board will grant him parole in July 2019, and, if it did, that Father would have housing and a job to provide for Child.

Father argues that the Agency did not meet its burden and, rather than proving he suffered from a parental incapacity that could not or would not be remedied, the Agency only showed that Father was incarcerated and was not eligible for release until July 2019. Father's Brief at 8-9. He contends that he has done his best to keep in contact with Child, and enrolled in programs in prison. *Id.* Father notes that he sent Christmas "materials" to Child and

has coordinated with his mother to provide a familial placement source. *Id.* Finally, Father avers "he was forced to do all of this by himself, without meaningful help from anyone other than his mother." *Id.* at 10.

This argument ignores the finding of orphan's court that Father's efforts to maintain a relationship with Child while incarcerated were "belated." Trial Court Opinion, 8/17/18, at 7. Additionally, the orphans' court found "Father's attempts to explain delays in his participation in prison programs, as caused by others, to lack credibility." *Id*. Thus, we defer to the factual findings of the orphans' court and conclude that Father while incarcerated, "failed to utilize given resources and to take an affirmative approach to fulfill his parental duties." *In re D.J.S*., 737 A.2d 283, 286 (Pa. Super. 1999).

Father further argues that he will be able to alleviate the incapacity of his incarceration because it was not his own lack of parenting skills or other negative conduct that resulted in Child's initial placement, but rather his incarceration. Father's Brief at 9. In other words, Father is arguing that because he was not the custodial parent at the time the court adjudicated Child dependent, he has the capacity to parent Child once he is released from prison.

The factual record belies this assertion. Since the orphans' court found that Father waited over a year to have contact with Child and the effort was minimal, it is unreasonable to conclude that Father, once released from prison,

would engage in the substantial effort of providing regular and daily care of Child.

Following a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion in granting the petition pursuant to Section 2511(a)(2). Although Father's incarceration limited his ability to interact with Child, Father, who waited over a year to initiate regular contact with Child, did not take advantage of all of the opportunities to maintain a relationship with Child.

Additionally, at the time of the termination hearing, Child had been in foster care for twenty-three months and was in need of permanence and stability. While Father is eligible for parole in July 2019, there is no guarantee that the parole board will grant him parole and more importantly, no basis to conclude that once released Father will be able to be reunified with Child in a reasonable period of time. Thus, we agree with the orphan's court that Father would not be able alleviate the incapacity of his incarceration in a reasonable period of time and that the Agency met its burden under Section 2511(a)(2). Accordingly, the record supports the court's findings and conclusions with respect to Section 2511(a)(2).

**Termination Pursuant to Section 2511(b)**

With respect to Section 2511(b), we consider whether Child's developmental, physical, and emotional needs and welfare will be best served by the termination. That section provides:

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

In this context, the court must take into account whether a meaningful bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *Z.P.*, 994 A.2d at 1121. In particular, the trial court should consider "the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension." *Id.* (citation omitted).

The trial court, in considering what situation would best serve a child's needs and welfare, must examine the extent to which a child has a bond with the parent and whether that bond is so meaningful to a child that severance of it would destroy something that is necessary and beneficial to a child. *Id.*

Moreover, the trial court is not required to use expert testimony to decide whether a child has a meaningful bond with the parent, but may rely on evaluations provided by social workers and caseworkers. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.* Where there is no evidence of a meaningful bond between the parent and child, it is reasonable

to infer that no bond exists and it will not be detrimental to a child's needs to sever that bond. ***In re K.Z.S.***, 946 A.2d 753, 763 (Pa. Super. 2008).

Here, the orphans' court asserted that there is no evidence of record of a bond with Father such that, if broken, would cause detriment to Child. Trial Court Opinion, 8/17/18, at 8. Although Father sought additional time to prove he could parent following his release from incarceration, the court noted that Father's release would occur in 2019 at the earliest. ***Id.*** The court further observed that additional "years of uncertainty and ultimately, the potential removal from a foster home which has provided love, security, and stability" would have a negative impact on Child. ***Id.***

In addition, Ms. Gutshall testified that while Child loves Father, she "struggles [as] to what that bond or what that connection is." N.T., 6/4/18, at 15. She also opined that Father does not have a "parent/child" relationship with Child and stated that she did not believe that terminating Father's rights would be detrimental to Child. ***Id.*** at 15-16.

Ms. Gutshall also opined that termination was in Child's best interests. ***Id.*** She observed that Child has resided in a pre-adoptive foster home since May 2017, and Child's foster family meets her needs and supports her desire to maintain contact with Father and continue therapy for her emotional issues.

*Id.* at 22. She also stated that Child would like to be adopted by her foster family. *Id.* at 23.[4]

As required by Section 2511(b), the court weighed the evidence of any bond between Father and Child against Child's need for permanency and stability, and determined that termination would best serve Child's needs and welfare. The court noted, specifically, the uncertainty regarding Father's future and Child's need for stability and concluded that Child's need for permanency and stability outweighed any potential bond. The court concluded that foster parents, a pre-adoptive resource, could best serve Child's needs. *See Z.P.*, 994 A.2d at 1121; *K.Z.S.*, 946 A.2d at 763.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights involuntarily.

Decree affirmed.

Judge Lazarus joins the memorandum.

Judge Nichols files a Dissenting Memorandum.

---

[4] In addition, Child's legal counsel stated on the record that he had spoken with Child several times and that she had told him that she would like to be adopted by her foster family, and did not want to move to New York to live with Paternal Grandmother. N.T., 6/4/18, at 22-23, 47-48.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/18/2019